Riley (x4959)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

✓ ___ FILED   ___ ENTERED
____ LOGGED _____ RECEIVED

**11:33 am, Jul 19 2023**

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**IN THE MATTER OF THE SEARCH OF:**

**THE DEVICES DESCRIBED IN ATTACHMENT A THAT ARE LOCATED AT A SECURE LOCATION IN THE HOWARD COUNTY POLICE DEPARTMENT**

**CASE NO.**   23-mj-1787-MJM

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT**

I, Melissa Macaron, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

**A. Purpose of Affidavit**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search of six electronic devices, which are currently in law enforcement possession, more fully described below and in Attachment A, and the seizure of the records and information described Attachment B.  This warrant seeks permission to seize the devices listed in Attachment A as well as to perform new and full forensic examinations of each device.[1]

2.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1591(a)(1), (b)(1), sex trafficking by force, fraud, or coercion have been committed by William Oniel Murray III ("MURRAY").  There is also probable cause to search the devices described in Attachment A

---

[1] Pursuant to previous state search warrants, extractions of certain of the devices were previously performed by the Howard County Police Department.  Your affiant is currently in possession of summaries of these extractions.

1

for evidence, instrumentalities, contraband, and fruits of these crimes further described in
Attachment B.

**B.  Agent Background and Experience**

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have
been since December 2020. I am currently assigned to the Winchester Resident Agency out of
the FBI Richmond Field Office. I am a graduate of the FBI Academy in Quantico, Virginia. As
part of my training to become a Special Agent, I received approximately 16 weeks of instruction
at the FBI Academy.  This training including topics of Fourth Amendment searches, probable
cause, and preparing and executing search warrants. Since graduating from the Academy, I have
received further training in federal law, including, but not limited to, sex trafficking and other
crimes.

4.      Prior to becoming a Special Agent with the FBI, I attended and graduated from
Arizona Summit Law School. During law school, I focused my studies on federal criminal law
and procedures. I passed the Uniform Bar Exam and am currently a member of the New Mexico
State Bar.

5.      As an FBI Special Agent, I have conducted and participated in investigations
involving a variety of crimes, such as crimes against children, human trafficking, white collar
crimes, bank robberies, and civil rights violations. In the course of conducting these
investigations, I have been involved in the use of the following investigative techniques:
interviewing victims, witnesses, and subjects; conducting physical surveillance; consensual
monitoring; and analyzing records associated with social media accounts, IP addresses, and
phone numbers. I have participated in the execution of numerous state and federal arrest
warrants and search warrants, as well as prepared search warrants for electronic devices and
reviewed results obtained from executed search warrants for electronic devices.  I am familiar

with the types of information that can be gleaned from cellular telephones, including call records, text messages, location information, and application data.  As a law enforcement officer, I am authorized to execute warrants issued under authority of the United States.

**C.  Sources of Information**

6.      I have personally participated in the investigation of the offenses described below.  The facts and information contained in this affidavit are based upon my personal knowledge, my training and experience, information obtained from federal and state law enforcement officers, and information obtained from interviews. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Further, this affidavit reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds and new information is gathered.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      The property ("**TARGET DEVICES**") to be seized and searched (further described in Attachment A) is as follows:

a.  Samsung SM-G360TI Galaxy Core Prime (related to phone number (443)993-9290) (HCPD evidence item number 5775-04); and

b.  LG GSM MS330 (related to phone number (202)290-9059) (HCPD evidence item number 5775-03);

c.  Apple A 1453 iPhone 5S (HCPD evidence item number 5775-02);

d.  ZTE cell phone N817 FCC ID SRQ-ZTEN817 (HCPD evidence item number 5775-11);

e.  LG 328BG cell phone (related to phone number (443) 570-6845) (HCPD evidence item number 5775-01); and

f.  SIM card in LG 328BG cell phone (related to phone number (443) 570-6845.

## STATEMENT OF PROBABLE CAUSE

8.     In July 2022, FBI Winchester initiated an investigation into sex trafficking by William Oniel MURRAY III. Since the initiation of the investigation, five (5) of Murray's adult sex trafficking victims have been identified and interviewed, including Adult Victim ("AV")2, AV3, AV6, AV7 and AV8.   In totality, these victims described being sex trafficked by MURRAY from as early as 2015 through as recently as July of 2022 when MURRAY was arrested by Virginia State Police (VSP).

9.     Upon MURRAY's arrest by VSP in July 2022, at least three cell phones were located and connected to MURRAY through examination of the contents of these phones. Pursuant to state search warrants, VSP created extractions of the three cell phones connected to MURRAY. VSP has given your affiant a copy of the extractions. Through review of the cell phone extractions connected to MURRAY, law enforcement has obtained evidence that MURRAY used the cell phones to book hotel rooms for the Adult Victims in various states and locations as well as to facilitate "dates" for the Adult Victims.

10.     Based on facts obtained throughout this investigation and laid out in the following paragraphs, there is probable cause to believe that MURRAY used force, fraud, or coercion to cause several adult victims to engage in commercial sex acts for his financial benefit. There is further probable cause to believe evidence of these crimes will be found in the **TARGET DEVICES**.

### A.  Sex Trafficking by Force and Drug Coercion

11.     Through interviews, AV2, AV3, AV6, AV7, and AV8, all reported similar conduct by MURRAY. As examples, AV2, AV3, AV6, AV7, and AV8 stated that MURRAY had multiple individuals "working" for him at any given time, and these victims completed commercial sex acts at his direction.

12.     Each victim stated that MURRAY maintained strict control over their activities. MURRAY posted advertisements on commercial sex websites and arranged "dates"[2] for the victims with clients. The dates usually took place in hotel rooms or at the client's location.  The victims were not allowed to have access to their own cell phones most of the time. MURRAY took the personal cell phones of AV2, AV6, and AV8. AV3 and AV7 did not have a cell phone when they worked for MURRAY. MURRAY would sometimes allow the victims to use one of his cell phones if MURRAY was going to be away from them in order to stay in touch with MURRAY.  However, MURRAY told the victims that the cell phone he provided them was duplicated to his own so that he would know if they tried to talk to anyone other than himself or clients. MURRAY required the victims to stay in communication with him regarding their commercial sex dates. MURRAY called the victims within a few minutes of the beginning of their date to verify that the clients had paid the victims for the commercial sex acts. MURRAY maintained control over where the victims were by not allowing them to leave the hotel rooms without MURRAY's permission.

13.     AV2, AV3, AV6, AV7, and AV8 all stated that MURRAY controlled them using narcotics. MURRAY did not allow these victims to obtain drugs from anyone other than himself. Because the victims were not allowed to obtain narcotics from any other supplier, MURRAY was the sole person who controlled their access to drugs. The victims were dependent on their narcotic of choice, which was heroin for AV3, AV6, AV7, and AV8 and crack cocaine for AV2. Without heroin, the addicted victims described getting "dope sick."[3] Thus, MURRAY stood between his victims' addiction and the threat of withdrawal. MURRAY

[2] Based on my training and experience, the term "date" is used the commercial sex trade to convey the occurrence of a sexual activity in exchange for money from a "customer."
[3] Based on my training and experience, "dope sick" is a common term for the sickness experienced during withdrawal from heroin and other opiates. Some of the symptoms include insomnia, vomiting, nausea, chills, body aches, diarrhea, and night sweats. One victim described being "dope sick" as like the flu, but five times worse.

withheld heroin and other drugs from the victims until they completed the dates MURRAY arranged for them. MURRAY also used the threat of letting the victims get "dope sick" to coerce obedience.

14.     AV2, AV6, AV7, and AV8 were either subjected to MURRAY's violence themselves or saw MURRAY use violence on other individuals to coerce obedience. AV2 reported that she had to be hospitalized for injuries sustained from a physical assault by MURRAY. Victims who were not subject to MURRAY's physical violence stated that they knew what would happen if they disobeyed MURRAY, meaning that they were afraid of physical violence. AV2, AV6, AV7, and AV8 stated that MURRAY always had a firearm on him.

15.     AV2, AV3, AV6, AV7, and AV8 stated that MURRAY set the prices for commercial sex acts. Victims were required to give all commercial sex proceeds to MURRAY. If the victims did not provide him with all proceeds, MURRAY punished them. Several of the listed victims, who were trafficked from 2015 to 2017, stated that they could keep a portion of the commercial sex proceeds, but that the money had to be used to purchase drugs from MURRAY. Thus, all portions of the commercial sex proceeds were ultimately turned over to MURRAY.  AV2, trafficked by Murray in 2022, stated that she had to give all of the proceeds from commercial sex to MURRAY.  The victims' descriptions of MURRAY's conduct is consistent with my training and experience with sex trafficking cases. Perpetrators of such crimes attempt to control their victims' finances and freedoms (such as decision-making and contact with others) to limit their ability to escape the scheme and maximize the exploiter's profits.

16.     AV2, AV6, AV7, and AV8 stated that MURRAY rented hotel rooms across the United States to be used for commercial sex dates. AV2, AV6, AV7, and AV8 also stated that

MURRAY continually sought to recruit new victims. MURRAY often targeted females who appeared to be addicted to narcotics, usually heroin. MURRAY targeted these women because MURRAY was able to exploit their drug addiction to coerce them to engage in commercial sex acts at MURRAY's direction.

17.     AV2, AV3, AV6, AV7, and AV8 described traveling from hotel to hotel across multiple states to complete commercial sex acts at MURRAY's direction. The victims described traveling between Virginia, Maryland, Pennsylvania, North Carolina, West Virginia, New York, New Jersey, and Florida, as well as potentially other states.

18.     MURRAY is currently charged with one count of sex trafficking of AV2, in violation of 18 U.S.C. 1591(a), in the Western District of Virginia.

**B.  AV7**

19.     In December 2022, your affiant was notified that a victim specialist located in Waynesboro, Virginia, was contacted by a female, later identified as AV7, who claimed that she was sex trafficked by MURRAY.  AV7 later explained that she was trafficked by MURRAY for three years and was in fear of her life because she had been receiving death threats. AV7 believed that these threats were related to MURRAY.  AV7 was interviewed by your affiant and an FBI Task Force Officer in January 2023.

20.     Around 2016, AV7 met MURRAY while AV7 was doing commercial sex work on her own by walking the streets of Baltimore, Maryland.  At this time, AV7 was homeless and addicted to heroin. MURRAY pulled up beside AV7 while she was walking and asked AV7 if she did "dope" and "coke," to which AV7 replied that she did. MURRAY told AV7 to get in his car and he gave her drugs. After taking the drugs given to her by MURRAY, AV7 fell asleep. When AV7 woke up, she was in a different state. AV7 did not know where she was and did not have any of her belongings with her, including her cell phone. For the first couple of weeks,

MURRAY provided free drugs, food, and a place to stay to AV7. Eventually, MURRAY told AV7 that she had to pay him back for all the free things that he provided her by working for him in commercial sex.

21.     AV7 knew of at least nine other female victims who worked for MURRAY at the same time AV7 worked for MURRAY. MURRAY would take a picture of the female victims' IDs.

22.     AV7 saw MURRAY drive up to other females who were walking the street and give them drugs and tell them to get in his vehicle. MURRAY would target females who looked young and addicted to drugs.

23.     AV7 stated that MURRAY posted advertisements on commercial sex websites in order to set up dates for AV7. MURRAY was the only one who had access to the advertisements that were posted for AV7 and other female victims who were working for him at the time.

24.     AV7 stated that AV7 did not have a phone, but MURRAY had three phones. MURRAY controlled the phones that were used to set up dates with clients. MURRAY sometimes allowed AV7 to text clients on the phones to set up dates, however AV7 was not allowed to talk to anyone else using MURRAY's cell phones. MURRAY did not allow AV7 or the other women working for him to call anyone, including the front desk of the hotel.

25.     AV7 explained that MURRAY had rules for the women he trafficked. Some of the rules included that the victims were not allowed to take drugs from anyone other than MURRAY, the victims were not allowed to go anywhere without MURRAY's permission, the victims had to stay in communication with MURRAY, and all the money that the victims earned for the dates went to MURRAY.

26.     AV7 detailed how MURRAY controlled her and the other women through their heroin addictions.  If the victims did not follow MURRAY's rules, MURRAY would punish them. MURRAY would often make the victims get "dope sick" and either not allow the victims to complete commercial sex dates to earn money to buy drugs from MURRAY or make the victims complete dates while they were feeling sick.

27.     AV7 witnessed MURRAY hit other people. AV7 also knew that MURRAY had a gun that he kept with him. AV7 feared MURRAY so she never challenged him.

28.     AV7 tried to leave MURRAY several different times, but MURRAY always found AV7. When MURRAY found AV7, MURRAY would tell her to get in his vehicle and yell at her. If AV7 ran, then MURRAY would chase her. Once AV7 was back with MURRAY, he would calculate how much money AV7 would have made if she was doing dates during the time that she was gone. MURRAY made AV7 pay him back by completing dates while dope sick until AV7 earned back the money MURRAY claimed she owed him.

29.     AV7 described MURRAY as a "master manipulator." MURRAY was violent when he needed to be, but MURRAY could easily manipulate people without violence as well.

30.     MURRAY was arrested and charged with Human Trafficking- Force (Nolle Pros), Human Trafficking -Take Cause (Guilty), Human Trafficking – Compensation (Nolle Pros), Human Trafficking – Benefit Financially (Nolle Pros), Prostitution – General (Nolle Pros), Prostitution – General (Nolle Pros) and Prostitution – Business (Guilty), in Howard County, Maryland on March 30, 2017. AV7 was with MURRAY at the time of his arrest.

31.     At the time of MURRAY's arrest the **TARGET DEVICES** were located in MURRAY's vehicle and seized by Howard County Police Department (HCPD). HCPD obtained state search warrants authorizing the search and extraction of the **TARGET DEVICES**.

**C. AV8**

32.     Through the course of the investigation and multiple victim interviews, AV8 was identified as a potential victim of sex trafficking by MURRAY. AV8 was interviewed by your affiant and an FBI Task Force Officer in March, 2023.

33.     AV8 stated that she met MURRAY in either late 2015 or early 2016.  AV8 was working in commercial sex and addicted to heroin.  MURRAY convinced AV8 to work for him in commercial sex by promising her protection. MURRAY did not protect AV8 while she worked for him. AV8 was raped at least once by two men while working for MURRAY.

34.     AV8 remembered that MURRAY posted commercial sex advertisements for AV8 the same night that she met him.

35.     AV8 stated that not long after AV8 started working for MURRAY, MURRAY took away AV8's personal cell phone.

36.     AV8 described that MURRAY allowed AV8 to keep some of the money that was earned on the dates, however, all of AV8's money ultimately ended up going back to MURRAY because MURRAY made AV8 purchase her drugs from him with the remaining money he allowed her to keep.

37.     AV8 knew that MURRAY set all of the prices for the AV8's dates.

38.     AV8 knew of at least four other victims who worked for MURRAY at the same time as AV8. AV8 stated that MURRAY often targeted females who were walking the street and addicted to drugs.

39.     AV8 told investigators that the victims were not allowed to go anywhere without MURRAY's permission. MURRAY told AV8 that the cell phone that she was occasionally allowed to text clients on was mirrored to MURRAY's phone.  Thus, MURRAY always knew what was happening on the cell phone if it was given to AV8 or another victim.

40.     AV8 stated that MURRAY had his own number, (443) 993-9290[4], saved as "Jack Sparrow" in the cell phone that the victims were sometimes allowed to use.  Through the phone extraction summary provided to the FBI by HCPD, the -9290 cell phone number is known to investigators to be connected to **TARGET DEVICE** HCPD evidence item 5775-04.

41.     AV8 detailed that MURRAY taught the female victims ways to try and identify a police officer posing as a client. MURRAY also taught the female victims what to say and do if they did meet a police officer in order to protect MURRAY. MURRAY told AV8 to not give any information to the police.

42.     AV8 stated that MURRAY controlled the victim's drug access. MURRAY did not allow the female victims working for him to purchase drugs from anyone other than MURRAY. AV8 knew that MURRAY used drugs as a way to incentivize the victims to do dates in order to not get dope sick.

43.     AV8 remembered that if the victims broke any of MURRAY's rules, MURRAY would punish them. Often, MURRAY would punish them by not letting the victims go on dates to earn money to pay for their drugs. This would typically cause the victims to become dope sick.

44.     AV8 detailed that at least once, MURRAY paid a female to beat up AV8 because MURRAY thought that AV8 had broken one of his rules. MURRAY told AV8 that her punishment would have been more severe if they had "not been family."

45.     MURRAY told AV8 that he had a gun in case AV8 decided to "try anything".

46.     AV8 was able to leave MURRAY when MURRAY was upset with AV8 for talking too much to a client. MURRAY told AV8 that as punishment for talking too much, AV8

---

[4] AV8 did not remember MURRAY's phone number, but provided your affiant a screenshot of a contact page for "Jack Sparrow" with the phone number (443) 993-9290.

would have to stay by herself at the apartment while being dope sick until she was supposed to

visit her family for Christmas. AV8 told MURRAY that she would not do that and told

MURRAY to drop her off at her storage unit. MURRAY took AV8 to her storage unit and left

her.

47.     Since AV8 left MURRAY, MURRAY has tried to hang out and be friendly with

AV8. AV8 is aware that MURRAY uses this tactic as a way to get previous victims to work for

him again. AV8 did not hang out with MURRAY because she did not want MURRAY to know

where she was. AV8 thinks that if given the chance, MURRAY would emotionally hurt AV8 or

do anything that he could to hurt her or her family. AV8 believes that MURRAY would

physically hurt her if MURRAY knew where she was.

**D**. **Identification of the TARGET DEVICES**

48.     On March 30, 2017, MURRAY was arrested and charged with Human

Trafficking- Force (Nolle Pros), Human Trafficking -Take Cause (Guilty), Human Trafficking –

Compensation (Nolle Pros), Human Trafficking – Benefit Financially (Nolle Pros), Prostitution

– General (Nolle Pros), Prostitution – General (Nolle Pros) and Prostitution – Business (Guilty),

in Howard County, Maryland. At or around the time of his arrest for human trafficking, the

**TARGET DEVICES** were seized from MURRAY's vehicle. Four of the **TARGET**

**DEVICES** were found at the time of MURRAY's arrest and one **TARGET DEVICE** was

found pursuant to a vehicle search warrant.  HCPD then obtained and executed search warrants

for the **TARGET DEVICES** that were issued by the District Court of Howard County. An

extraction of one of the cell phones did not work, but HCPD was able to perform an extraction

off of the SD card located in that cell phone. HCPD provided VSP and an FBI TFO with an

extraction summary report of two of the **TARGET DEVICES**—(HCPD evidence items 5775-

003 and 5775-004). The summary of the extractions provided by HCPD merely provides a

glimpse of what was found on MURRAY's cell phones related to human trafficking but is not intended to provide the results of the full cell phone extractions or evidence contained within the phones. All of the **TARGET DEVICES** have been properly maintained in the custody of HCPD since their seizure and are in the same condition as the time of their seizure.

49.     Some examples of what was described on the provided extraction summary of two of the **TARGET DEVICES** details text messages between MURRAY and possible victims, as well as conversations with clients to set up dates. The extraction summary also shows photographs of what appear to be victims, including victims who have already been identified in this investigation. Further, among other things, the extraction summary provides hotel transactions that were created by MURRAY, Backpage[5] searches, as well as internet search history that includes searches for "How to Avoid Backpage Prostitution Sting For Dummies".

50.     The summary of the extractions of the **TARGET DEVICES** contain numerous messages and account information related to human trafficking, based on my knowledge and experience.  For example, the extraction summary shows that the word "Outcall" was used approximately 23 times in the cell phone. Based on my training and experience, "Outcall" refers to a commercial sex date that will take place at the client's location instead of the client coming to the commercial sex worker.

51.     Another message from the extraction report of **TARGET DEVICE** HCPD evidence item 5775-04 was from an unknown individual that said "I know you said send to him but I want to make sure with you first. I don't wannna screw this up." Based on my training,

---

[5] Based on my training and experience, I know that Backpage was an online forum used by individuals to post advertisements for commercial sex.  Backpage was used extensively by individuals involved in human trafficking. In or about 2018, Backpage was seized by federal law enforcement and is now defunct.

experience, and conversations with other victims, this is an example of the level of control that MURRAY had over his victims and is consistent with text messages between MURRAY and his known victims in this investigation based on the review of MURRAY's phones found at his arrest in July 2022.

52.     Another message from an unknown subject stated: "…I am keeping my makeup and hair done and will be ready if you give me another opportunity to work…" Based on my training and experience, this message indicates that there is probable cause to believe that there are more unknown victims that the **TARGET DEVICES** may help investigators identify.

53.     The extraction of **TARGET DEVICE** HCPD evidence item 5775-03 also shows a photograph of MURRAY[6] standing in front of a Marriott located in Springfield, Virginia. This photograph matches a photograph of MURRAY that was sent to your affiant by AV8. Based on my training and experience, the matching photographs indicate that there is probable cause to believe that the T**ARGET DEVICES** contain evidence related to AV8's victimization by MURRAY.

54.     Photos of AV7 have been found on the **TARGET DEVICES**.

55.     Moreover, based on my training and experience investigating human trafficking, I know that it is common for individuals engaged in this activity to use telephonic communications cellular (to include voice and text messages) to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in sex trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for sex traffickers to use multiple "smart" phones

---

[6] I am familiar with MURRAY's physical appearance from, among other things, his in-person court appearances in the Western District of Virginia.

to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement.

56.     Based on the facts set forth above, there is probable cause to believe that evidence of MURRAY's violation of 18 U.S.C. 1591 will be found in the **TARGET DEVICES.**  There is further probable cause to believe that that there will be evidence located on the **TARGET DEVICES** that will assist investigators in identifying additional victims of MURRAY's sex trafficking.

### TECHNICAL TERMS

57.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> g.  *Wireless telephone:*  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

> h.  *Digital camera:*  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

i. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

j. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

k. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

l. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save

data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

m. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

n. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

o. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

58.     Based on my training, experience, and research, I know that the devices described in Attachment A have capabilities that allow them to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, user attribution evidence—evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

60.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it contains evidence described by the warrant.

62.  *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

63.  I submit that this affidavit supports probable cause for a search and seizure warrant authorizing the search of the devices described in Attachment A and the seizure of the records and information described in Attachment B.

Respectfully submitted,
/s/ Melissa A. Macaron
Special Agent Melissa Macaron
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____26th_____ of June 2023.

_____
THE HONORABLE MATTHEW J. MADDOX
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

1. The property to be searched is currently stored at the Howard County Police Department (HCPD) and is described further as follows:

    a.   Samsung SM-G360TI Galaxy Core Prime (related to phone number (443)993-9290) (HCPD evidence item number 5775-04); and

    b.   LG GSM MS330 (related to phone number (202)290-9059) (HCPD evidence item number 5775-03);;

    c.   Apple A 1453 iPhone 5S (HCPD evidence item number 5775-02);;

    d.   ZTE cell phone N817 FCC ID SRQ-ZTEN817 (HCPD evidence item number 5775-11);

    e.   LG 328BG cell phone (related to phone number (443) 570-6845) (HCPD evidence item number 5775-01); and

    f.   SIM card in LG 328BG cell phone (related to phone number (443) 570-6845

## ATTACHMENT B

**I.      Information to be Seized by the Government**

1.      All records on the devices described in Attachment A that relate to violations of

18 U.S.C. 1591, sex trafficking by force, fraud, or coercion and involve William Oniel

MURRAY III ("MURRAY"), and others, including:

      a.  Any conversations, whether through text messages or other applications, concerning commercial sex work;

      b.  Lists of potential victims and client contacts and related identifying information;

      c.  Types, amounts, and prices of commercial sex date transactions set by MURRAY as well as dates, places, and amounts of specific transactions;

      d.  Any information relating to (including names, addresses, phone numbers, or any other identifying information) or communications with MURRAY's co-conspirators or associates in MURRAY's sex trafficking;

      e.  Any information relating to the schedule or travel of MURRAY and his co-conspirators;

      f.  All bank records, checks, credit card bills, account information, and other financial records;

      g.  Communications, by whatever means made, between MURRAY and persons with whom he was communicating with regarding commercial sex.

2.      Evidence of user attribution showing who used or owned the devices at the time

the things described in this warrant were created, edited, or deleted.  Such evidence might

include logs, phonebooks, saved usernames and passwords, documents, and browsing history.

With respect to the search of any of the items described above which are stored in the form

of magnetic or electronic coding on computer media or on media capable of being read by a

computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash

drives, hard disk drives, or removable digital storage media, software or memory in any form), the

search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.  "scanning" storage areas to discover and possible recover recently deleted files;

d.  "scanning" storage areas for deliberately hidden files; or

e.  performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation

f.  If after performing these procedures, the directories, files or storage areas do not reveal evidence of criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably

practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.